# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Marriage of: | No. 46525-6-II |
| IAN QUINONES, | |
| Appellant, | |
| and | UNPUBLISHED OPINION |
| SUSAN QUINONES, | |
| Respondent. | |

MAXA, J. — Ian Quinones appeals from the trial court's ruling following a post-dissolution bench trial that allowed Susan Quinones to relocate with the couple's child to Peoria, Arizona. Ian[1] argues that seven of the trial court's findings regarding the child relocation factors in RCW 26.09.520 are not supported by substantial evidence and that the trial court's order granting the relocation request is not supported by the factual findings. We disagree and affirm.

## FACTS

Ian and Susan Quinones were married in April 2008 in Phoenix, Arizona, while Ian was in the Air Force. In September 2008, Ian received an honorable discharge and accepted a position with the Federal Aviation Administration (FAA) in Washington. Ian and Susan moved

---

[1] For clarity, this opinion refers to the parties' by their first names. No disrespect is intended.

to Washington. Susan obtained employment with the Washington Department of Social and Health Services (DSHS). The parties had a son, CQ, in December 2009.

Ian served with the Air Force reserves and was deployed to Afghanistan in July 2011, while Susan and CQ remained in Washington. During Ian's deployment, Susan told Ian that she wanted to move to Arizona after finding a new employment position there. Ian opposed the move. Susan and CQ remained in Washington. Ian's deployment ended in February 2012, and he returned to Washington. Once Ian returned from deployment, he travelled to Korea twice, each time for three weeks.

*Dissolution and Request to Relocate*

In June 2012, Ian filed a petition for dissolution. In April 2013, Susan filed her proposed parenting plan, which included a notice of intended relocation of herself and CQ to Arizona. Ian objected to the motion and filed a motion to restrain the relocation. The trial court appointed a guardian ad litem (GAL), who issued a report recommending against relocation. In June 2013, the trial court commissioner entered an agreed temporary order restraining Susan's proposed relocation pending a final determination at trial.

In August 2013, the parties entered into a final parenting plan. The final parenting plan did not address Susan's relocation request. The parties' parenting plan provided for Susan to be CQ's primary residential parent and for Ian to have visits with CQ from 3:00 P.M. to 6:00 P.M. Monday through Friday, as well as overnight visits every other weekend. The trial court entered the parties' decree of dissolution in December 2013.

In February 2014, Susan filed a second notice of her intent to relocate to Peoria, Arizona with CQ. Ian objected to the proposed relocation. In April 2014, the trial court denied Susan's

temporary order to relocate after finding that there was not a compelling reason to relocate before the parties' trial on June 2, 2014. The trial court also declined to appoint a GAL.

The parties' relocation trial took place in June 2014. The trial court heard testimony from Susan and Ian as well as a number of other witnesses.

*Susan Testimony*

Susan gave three reasons for moving to Arizona. First, she testified that she and CQ would benefit from having Susan's extended family members nearby, including her mother, siblings, and nieces and nephews. Susan's family members lived in the Phoenix and Tucson metropolitan areas. RP 205. Although Susan admitted that she and CQ would have to drive at least an hour and a half to visit certain family members, she testified that she had many friends who lived within five-to-ten miles of Peoria. Despite the distance between Peoria and Tucson, where Susan's mother lived, Susan testified that she expected that her mother intermittently would assist with caring for CQ. Carol Spiller, Susan's mother, confirmed that she was available during the day and night to assist with CQ's care.

Second, Susan testified that CQ's health and her health would benefit from a move to Arizona. CQ has asthma that is triggered by cold air, and Susan testified that CQ's doctor suggested that it would be better for CQ to live in a drier, warmer environment. This testimony was supported by CQ's medical records, which stated that CQ had a number of allergies and was instructed to avoid pollens. Susan testified that her own health would improve also in Arizona because her own grass, pollen, and mold allergies were not as severe in Arizona. Since Susan has been living in Washington, her allergies have flared up to the point she has required tubes to be inserted in her ears.

Susan's third reason for relocating to Arizona was to return to her family history and roots in Arizona. Her mother and most of her family were born and raised in Arizona, and her maternal grandmother immigrated to Arizona. Susan has spent 29 of her 36 years in Arizona.

Susan reported that she had received a job offer to work as the head of human resources (HR) of a local Arizona restaurant, which would provide her with an annual $37,500 salary. The restaurant was located in Tucson, but Susan could telecommute to perform her HR duties. She would be required to be at the restaurant two to four days a month. Susan testified that she did not plan to work there long term, but planned to find employment closer to Peoria in her field of study, social work program administration. Susan testified that she hoped to rely on her previous contacts in Arizona to find different employment.

Susan also presented evidence that Ian resisted CQ's asthma treatment. Ian wrote a letter to CQ's doctor stating that he did not believe that CQ needed two puffs from his inhaler a day as prescribed. Ian also chose to keep both a dog and a cat in his home despite CQ's dog and cat allergies.

When Susan was working at the DSHS, she was earning $42,000 a year. However, Susan asserted that her lower salary in Arizona would be sufficient to cover her expenses, explaining that the cost of living in Arizona was much lower than in Washington. Susan admitted that she had not applied for jobs in Washington, but explained that she had not applied for Washington jobs because she was raising CQ full time.

Susan testified that she believed that her proposed parenting plan, which would go into effect if the relocation was granted, would be better for both CQ and Ian because it allowed for

4

them to have more time together. Instead of Ian and CQ visiting for three hours at a time Monday through Friday, Susan's proposed plan provided for Ian and CQ to visit, in part, for six weeks in the summer in two week intervals. Susan believed that CQ's asthma would not be aggravated during Washington summers.

*Ian Testimony*

Ian testified as to the quality of his relationship with CQ. He stated the two would practice CQ's reading skills, play games, and dance together whenever CQ visited. And Ian testified that when he had CQ on the weekends, they spent time at the YMCA swimming and doing other activities. Ian was CQ's care provider whenever CQ was visiting. When asked what the detrimental effect would be on Ian in the event CQ relocated, Ian responded, "[CQ] is my life. I mean, he's my son." Report of Proceedings (RP) at 145. Aida Perez, Ian's sister, and LeAnn Watzlawick, Ian's girlfriend, also testified that Ian's relationship with CQ was nurturing and loving and that relocation would be difficult and would impact Ian and CQ's bond.

Ian objected to CQ's relocation because he believed the center of CQ's life was in Washington. CQ had friends in Washington, both Ian and Susan were in Washington, and Ian believed Washington was a good place for CQ to reside. Ian was unable to specifically name any of CQ's friends, but suggested that CQ's friends were children at daycare. Ian admitted that there were several times when he had not been able to retrieve CQ, including occasions when Ian was out of town for the FAA. And Ian admitted that there were times when CQ resisted going with Ian when it was Ian's visitation time.

Ian testified that he did not have any viable employment opportunities through the FAA in Arizona. In addition, he testified that financially it would be very difficult to travel regularly

between Arizona and Washington. He reported that taking the time off work that he would need to travel to Arizona could jeopardize his employment with the FAA.

*Trial Court Ruling*

After considering the statutorily mandated relocation factors on the record and entering detailed findings of fact for each, the trial court granted Susan's request to relocate. The trial court found that Ian failed to overcome the statutory presumption that a proposed relocation will benefit the relocating parent and child. Ian appeals.

ANALYSIS

A.     STANDARD OF REVIEW

Trial courts have wide discretion to decide where and with what parent a child will reside when it comes to child relocation matters. *In re Marriage of Rostrom*, 184 Wn. App. 744, 751-52, 339 P.3d 185 (2014). We review a trial court's relocation decision for an abuse of discretion. *Id.* at 750. The trial court abuses its discretion when it makes a manifestly unreasonable decision or bases its decision on untenable grounds or reasons. *Id.* This can occur if a court applies an incorrect legal standard, substantial evidence fails to support the trial court's findings, or the findings do not meet the requirements of the correct standard. *Id.*

We do not review the trial court's credibility determinations or weigh conflicting evidence. *Id.* Because there is a strong interest in the finality of marriage dissolution proceedings, we defer to the trial court and will affirm its decision unless no reasonable judge would have reached the same conclusion. *Id.* " 'The emotional and financial interests affected by such decisions are best served by finality. The spouse who challenges such decisions bears the heavy burden of showing a manifest abuse of discretion on the part of the trial court.' " *In re*

6

*Marriage of Kim*, 179 Wn. App. 232, 240, 317 P.3d 555 (2014) (quoting *In re Marriage of Landry*, 103 Wn.2d 807, 809, 699 P.2d 214 (1985)).

B.      RELOCATION FACTORS

The Child Relocation Act (CRA), RCW 26.09.405-.560, provides notice requirements and standards for changing the primary residence of a child who is the subject of a court order regarding residential time. *In re Marriage of Wehr*, 165 Wn. App. 610, 612, 267 P.3d 1045 (2011). If a person entitled to residential time or visitation objects to a child's relocation, the proposed relocation may not occur without court approval absent special circumstances. RCW 26.09.480(2).

RCW 26.09.520 provides an outline for determining whether the trial court should grant a motion for relocating with a child. First, the person proposing the relocation must provide his or her reasons for the intended relocation. *Id.* There is a rebuttable presumption that the relocation will be permitted. *Id.* The basis for this presumption is that a fit parent will act in the best interests of his or her child. *In re Marriage of Horner*, 151 Wn.2d 884, 895, 93 P.3d 124 (2004).

Second, a party may object to the relocation by demonstrating that "the detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating person" based on consideration of 11 child relocation factors. RCW 26.09.520. The factors are:

> (1) The relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life;
> (2) Prior agreements of the parties;
> (3) Whether disrupting the contact between the child and the person with whom the child resides a majority of the time would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation;

7

(4) Whether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191;

(5) The reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation;

(6) The age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child;

(7) The quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations;

(8) The availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent;

(9) The alternatives to relocation and whether it is feasible and desirable for the other party to relocate also;

(10) The financial impact and logistics of the relocation or its prevention; and

(11) For a temporary order, the amount of time before a final decision can be made at trial.

*Id.* The trial court must make findings on the record regarding each of the RCW 26.09.520 factors. *Kim*, 179 Wn. App. at 241. The factors are equally important – they are not weighted or listed in any particular order. *Rostrom*, 184 Wn. App. at 752. The trial court's determination necessarily is subjective. *Id.*

The trial court applies a preponderance of the evidence standard in determining whether the party objecting to relocation has rebutted the presumption favoring relocation. *Wehr*, 165 Wn. App. at 613. Even if the objecting party rebuts the presumption, the burden of persuasion remains with that party. *In re Marriage of McNaught*, No. 72343-0-I, 2015 WL 4885752, at *7-9 (Wash. Ct. App. August 17, 2015). In order to prevent relocation, the opposing party must prove by a preponderance of the evidence that the factors show that relocation would be more detrimental than beneficial. *Kim*, 179 Wn. App. at 241.

8

Significantly, the CRA does not adopt a "best interests of the child" standard. *Id.* at 242-43. Instead, the RCW 26.09.520 factors incorporate the interests of both the child and the relocating parent. *Horner*, 151 Wn.2d at 895. In *Horner*, the Supreme Court emphasized that the relocating person's interests and circumstances are "[p]articularly important." *Id.* at 894. The court noted that many of the factors refer to the relocating person. *Id.* at 895 n.10.

C.      SUBSTANTIAL EVIDENCE SUPPORTS THE TRIAL COURT'S FINDINGS

Ian argues that substantial evidence does not support the trial court's findings on seven of the CRA factors. We disagree.

On review, we determine whether the trial court's findings are supported by substantial evidence and whether they reflect consideration of the appropriate factors. *Kim*, 179 Wn. App. at 244. Substantial evidence exists if the record contains evidence of a sufficient extent to persuade a fair-minded, rational person of the truth of the declared premise. *Id.* We do not reweigh the evidence. *Id.*

1.      Factor 1

The first relocation factor requires the trial court to consider the "relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life." RCW 26.09.520(1). Ian argues that the record does not include substantial evidence of the strength, nature, and quality of the relationship shared between Susan and CQ, as well as their emotional bond. We disagree.

The trial court stated,

> [Susan] has been primarily responsible for raising this child because of the career choice that Mr. Quinones had for a number [of] years, he ended up being deployed to Afghanistan, and he had other – he had other employment that

9

> interfered with his time with the child even after he got out of active military service.
>
> Mother has been more concerned about and responsible for the child's health care, especially his asthma and allergy therapy. Father has, in fact, discounted the child's need for asthma therapy, so factor number one favors mother.

Clerk's Papers (CP) at 363-64.

Substantial evidence supports the trial court's finding. Susan has been CQ's primary caregiver for his entire life, including after the parties' dissolution decree was finalized. Witness testimony showed that others believed Susan was a good parent and had a strong bond with CQ. And as Ian admits in his briefing, Susan plays "an active and consistent role in [CQ's] life." Br. of Appellant at 20. Susan presented evidence that she took CQ's need for asthma medication very seriously, while evidence demonstrated that Ian resisted CQ's need for asthma medication. This evidence sufficiently established Susan's bond and emotional ties with CQ.

Although Ian presented evidence of the strength of his relationship with CQ, Susan's evidence supported the trial court's finding. We defer to the trial court's weighing of the evidence. *Rostrom*, 184 Wn. App. at 750. Therefore, we hold that substantial evidence supports the trial court's finding that factor 1 favored Susan.

2. Factor 3

The third relocation factor requires the trial court to consider "[w]hether disrupting the contact between the child and the person with whom the child resides a majority of the time would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation." RCW 26.09.520(3). Ian argues that the evidence shows that disrupting CQ's contact with him would be more detrimental than disrupting CQ's contact with

Susan and that substantial evidence does not support the trial court's finding on this factor. We disagree.

The trial court stated,

> [T]his factor favors the mother again for the reasons that I listed with respect to factor number one.
> She has been primarily responsible for the child's health care and day-to-day care over the lifetime of the child, and she's been very concerned about his allergy problems and his asthma problems. Like I had mentioned before, the father has discounted the asthma therapy, so I believe that this factor weighs in favor of the mother because of that concern she has and the attention she's made to his health, the child's health.

CP at 365.

Substantial evidence supports the trial court's finding. As addressed above, evidence was introduced at trial that Susan has been CQ's constant and reliable care provider throughout his life. While Ian was deployed to Afghanistan, traveled to Korea, or was on business trips and only had contact with CQ through telephone calls or Skype, Susan had been the day-to-day care provider for CQ since his birth. Moreover, evidence was presented that Susan exhibited concern for CQ's asthma and allegories, but Ian did not believe that CQ need to be prescribed two puffs per day of Flovent and kept a cat and dog in his apartment despite CQ's allegories to both pets.

Although Ian presented evidence that he and CQ have a strong bond, healthy relationship, and frequent contact, Susan's evidence supported the trial court's finding. We defer to the trial court's weighing of the evidence. *Rostrom*, 184 Wn. App. at 750. Therefore, we hold that substantial evidence supports the trial court's finding on factor 3 that it would be more detrimental to disrupt CQ's contact with Susan.

3.     Factor 5

The fifth relocation factor requires the trial court to consider the "reasons of each person

for seeking or opposing the relocation and the good faith of each of the parties in requesting or

opposing the relocation."  RCW 26.09.520(5).  Ian argues that Susan was attempting to relocate

in bad faith to prevent his contact with CQ and that substantial evidence does not support the

trial court's finding on this factor.  We disagree.

The trial court found that neither Ian nor Susan acted in bad faith in the relocation

proceeding.  The trial court stated,

> Well, both parties have mentioned that the other side is acting in bad faith.
> Mr. Quinones says that the mother acted in bad faith by losing her job here in the
> State of Washington and not making a real effort to seek additional employment
> here in the State of Washington in her chosen field.
>     And mother, of course, claims that the father acted in bad faith by leading the
> mother to believe that he would move to Arizona before he filed his dissolution
> action here in the State of Washington.  I really don't think either side is acting in
> bad faith.
>     Mother thinks for health reasons it would be better for both her and the child to
> relocate to Arizona which was where she was born, where she has a lot of family
> and extended contacts.  That's where she went to college, I believe.  She got her
> master's degree I know in the State of Arizona.  She also graduated from high
> school down there.  There's lots and lots of reasons for her wanting to move back
> to Arizona.  She doesn't have family here.  She doesn't have a real circle of
> support here.
>     Mr. Quinones, at the same time, is acting in good faith because he now has a
> job here.  He's starting to establish a life here because he has a girlfriend here in
> the State of Washington.  He would like to make sure that he has more time with
> his child and he knows the time with his child is going to come in a different
> fashion if we have a long-distance parenting relationship for the child as opposed
> to a nearby parenting relationship with the child, so I don't think really either
> parent's acting in bad faith so I don't think this factor weighs in favor of either
> side.

CP at 365-67.

12

Substantial evidence supports the trial court's finding. Susan testified that she desired to relocate to Arizona to return to her family and roots in Arizona. Susan testified that because she was from Arizona and had family near her intended relocation area, she desired to return to Arizona so that CQ and she could spend additional time with her family. Moreover, Susan's mother could assist her with caring for CQ. RP 231-32. Susan testified, and evidence supported, that a move to Arizona could improve CQ's asthma. Similarly, Susan testified that her allergies would improve in Arizona due to the state's desert climate. Finally, Susan highlighted that her starting salary at her new position in Arizona would still allow her to meet her and CQ's basic needs and necessities due to Arizona's lower cost of living.

Although Ian presented some evidence suggesting that Susan acted in bad faith, Susan presented evidence of a good faith basis for seeking relocation. We defer to the trial court's weighing of the evidence. Therefore, we hold that substantial evidence supports the trial court's finding on factor 5 that Susan did not act in bad faith in seeking relocation.

4.    Factor 7

The seventh factor requires the trial court to consider the "quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations." RCW 26.09.520(7). Ian argues that substantial evidence did not support the trial court's finding that this factor weighed in favor of Susan. We disagree.

The trial court stated,

> Okay. So the opportunities available to the mother. She did identify a job opportunity that she can take advantage of right away, albeit not the greatest job opportunity because there will be some commuting involved; however, it's a flexible job. Don't necessarily have to be in the office every day of the week. She'll be able to do some telecommuting.

She testified that she didn't have a job here, she did lose her job here. There was a dispute about whether she intentionally lost her job or whether she lost her job because she kept having to come to court because of the proceedings in this case over the years. No one was able to identify with any reasonable – I'm not persuaded by the evidence that there was an intentional job loss. She lost her job because of her absences. Doesn't have another job. She has job opportunities in the State of Arizona. She has more family and contacts in the State of Arizona.

So, I think, you know, quality of life, resources, and opportunities for the child probably are going to be about the same in either location. But I think because of the better situation for the mother, and you have to look at both the - available to the child and to the relocating party in analyzing this factor, this factor just slightly favors mother.

CP at 368-69.

Initially, Ian argues that the trial court failed to articulate its consideration of the opportunities, resources, and quality of life available to CQ in both Arizona and Washington. The trial court must make findings on the record regarding each of the factors. *Kim*, 179 Wn. App. at 241. However, this does not require the trial court to orally delineate each fact it relied on in making such findings. Here, the trial court's finding regarding CQ's opportunities, resources, and quality of life was sufficient.

Further, substantial evidence supports the trial court's finding. Susan had employment opportunities in Arizona – a job offer with a good salary and flexible hours. Susan and CQ had resources in Arizona – nearby family that would help her with providing care to CQ. And Susan testified about quality of life issues involving her health and CQ's health.

Ian generally does not dispute these facts. Instead, he reargues a number of points that he made before the trial court: that Susan did not search for a position in Washington, Susan failed to detail specific networking opportunities in Arizona, Susan's Arizona position pays her less income, and that none of Susan's family members reside in Peoria, Arizona. Br. of App. at 26-

14

28. But the existence of competing evidence does not affect whether substantial evidence supported the trial court's finding.

Although Ian presented contrary evidence, we do not reweigh the evidence on appeal. *Rostrom*, 184 Wn. App. at 750. Therefore, we hold that substantial evidence supports the trial court's finding on factor 7 that the quality of life, resources, and opportunities available to CQ and Susan favors Susan.

    5.    Factor 8

The eighth factor requires the trial court to consider the "availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent." RCW 26.09.520(8). Ian argues that the alternatives for continuing CQ's relationship with Ian are not feasible or realistic because Susan has a history of withholding CQ from him, and therefore that substantial evidence does not support the trial court's finding on this factor. We disagree.

The trial court stated,

> The mother claims that the father can do face time and Skype, of course can travel to the State of Arizona to see the child. Father claimed during the trial that mother has in the past interfered with his Skyping of the child when he was in Afghanistan. I think the solution here is to have a very fixed, rigid schedule that mother cannot alter so that the father can indeed Skype or have face time with his child.
> Now, of course, I think both parties have to be aware of the child's age and may not have a long attention span but still I think the solution is to make sure that there's a fixed, rigid schedule that the mother may not alter unless there is some sort of emergency so that the father can have his Skype or face time with the child. So this factor, I've stated the reasons for it, there are alternative arrangements, yes. Certainly, as the child gets older, the child will be able to have other forms of communication.

CP at 369-70.

Ian directs us to the testimony of Penny Van Vleet, CQ's day care provider, and the GAL report filed during the parties' dissolution proceedings to support his claim that Susan withheld CQ from him. However, Van Vleet did not state that Susan withheld CQ from Ian; she stated that Susan was quiet about CQ's Skype visits with Ian. And even if the GAL report remarked and Ian testified that Susan could sometimes obstruct a father-son relationship, the trial court weighed this evidence against the evidence that Ian and CQ could Skype and travel to continue their relationship and CQ's access to Ian.

Substantial evidence supports the trial court's finding. Evidence was presented that Ian maintained a meaningful relationship with CQ while he was deployed to Afghanistan through Skype calls. Although Ian argues that travel to Arizona would be financially difficult, there was no evidence presented that this type of visitation could not be an "alternative arrangement" to continue his relationship with CQ. And the trial court addressed Ian's concerns about Susan interfering with Ian's relationship with CQ by adding a provision to the parenting plan setting up a specific schedule for Skype time. In additional, the proposed parenting plan allowing for relocation permitted Ian to have more overnight visits with CQ than under the existing parenting plan.

We defer to the trial court's weighing of the evidence. Therefore, we hold that substantial evidence supports the trial court's finding on factor 8 that there were alternative arrangements to continue the relationship between CQ and Ian and CQ's access to Ian.

6. Factor 9

The ninth factor requires the trial court to consider the "alternatives to relocation and whether it is feasible and desirable for the other party to relocate also." RCW 26.09.520(9). Ian

argues that substantial evidence does not support the trial court's finding on this factor. We disagree.

The trial court stated,

> Could the father relocate? The answer is yes, but I don't think he would be most likely wanting to do that given his current employment. The fact that he's now in a relationship with another woman, he doesn't have any family here in the State of Washington, apart from some relatives that he did identify, I believe, but the bulk of his relatives are not in the State of Washington. So he's starting to develop – he's starting to develop a community here.
> So, because of his job, I think, you know, this factor probably weighs in favor of the father. I don't think there's an alternative to relocation for him.
> Is there an alternative to relocation for mother? The evidence was she lost her job here. She's got a job opportunity there. She has more support there. So as far as the mother's concerned, it looks like things would be better for her there in Arizona. Things are better here for dad, so I think factor number nine doesn't favor either party.

CP at 370-71.

Initially, Ian argues that the trial court made contrary findings, first stating that the factor favored Ian and then stating that the factor did not favor either party. However, when the trial court's finding is read in context, the referenced statements are not contradictory. The trial court first found that Ian could not relocate to Arizona and for that reason, standing alone, the factor favored him. But then the trial court found that Susan did not have a viable alternative to relocation, which also meant that the factor favored her. Because the factor favored both parties, the trial court ultimately found that the factor favored neither when considered as a whole.

Substantial evidence supports the trial court's finding that the factor did not favor either party. Ian points to evidence in the record that (1) Ian could not transfer his FAA position to Arizona, (2) Susan could have found employment with the DSHS in Washington or in other placements in Washington, (3) CQ's asthma could be addressed in Washington through

17

medication and avoiding peanuts and tree nuts, and (4) Susan could facilitate her relationship with her family in Arizona through visitation. But the evidence also showed that Susan had no job or significant support system in Washington, and had both a job and the support of her family in Arizona.

We do not reweigh the evidence on appeal. *Rostrom*, 184 Wn. App. at 750. Therefore, we hold that substantial evidence supports the trial court's finding on factor 9 that the alternatives to relocation and the potential for Ian to relocate did not favor either party.

       7.    Factor 10

The tenth factor requires the trial court to consider the "financial impact and logistics of the relocation or its prevention." RCW 26.09.520(10). Ian argues that the trial court's finding on this issue is not supported by substantial evidence. We disagree.

The trial court stated,

> Let's talk about the prevention first. If the relocation is prevented then you have a mother who's out of work being supported by other means, can't go on very long. If she relocates, she'll have a job and other employment opportunities that she identified. She has family that can assist her in caring for the child in Arizona. Childcare here will be in the form of daycare.
> Probably the more important factor to look at is going to be consideration of the transportation costs. Father will have to spend money to visit the child in Arizona. It's certainly an important consideration in my evaluation.
> But, all in all, the more I think about it, when it says logistics, that part probably favors the father; but when you look at the financial impact on the mother on factor number ten and her employment opportunities, which I've mention[ed] over and over, it's probably a more important consideration than the transportation element. The more I think about it, the financial impact of the employment opportunities is more and more of an important factor to consider in factor number 10 than the transportation costs.

CP at 371-72.

18

Substantial evidence supports the trial court's finding. Susan testified that she had received a job offer in Arizona, which would provide her with an annual salary of $37,500. She also testified that she presently was unemployed in Washington due to her abandonment of her DSHS position, which she explained resulted in part from her attendance at court hearings during the dissolution proceedings. Ian testified that it would be financially difficult for him to travel to Arizona, and that he could be jeopardizing his employment with the FAA if he took the time off he needed to travel to Arizona. But the trial court weighed this evidence and concluded that the factor favored Susan.

We do not reweigh the evidence. *Rostrom*, 184 Wn. App. at 750. Therefore, we hold that substantial evidence supports the trial court's finding on this factor that Susan's continued unemployment, and her employment opportunities in Arizona, would have a broader financial impact than the financial impact on Ian that would arise from his travel to Arizona.

D.     TRIAL COURT'S DENIAL OF OBJECTION TO RELOCATION

Based on Ian's challenges to seven of the trial court's factual findings, he argues that the trial court erred in denying his objection to relocation. We disagree.

Here, the record shows that the trial court properly weighed the 10 relevant factors in RCW 26.09.520 and found that the majority of the factors favored Susan. Accordingly, the trial court found that Ian had not carried his burden to show that the detrimental effect of the relocation outweighed the benefits of the move to CQ and Susan. We review this decision for abuse of discretion. *Rostrom*, 184 Wn. App. at 750. Because substantial evidence supports the trial court's findings regarding the relocation factors, the trial court did not abuse its discretion.

19

We uphold the trial court's conclusion that Ian had not overcome the presumption that relocation should be allowed. Accordingly, we affirm the trial court's order permitting Susan and CQ's relocation to Arizona.

E.      ATTORNEY FEES

Susan requests that we award her reasonable attorney fees and costs under RAP 18.9(a) because Ian's appeal is frivolous. Ian argues that the trial court's findings were confusing, contradictory, and/ or not supported by substantial evidence, so his case presented debatable issues where reasonable minds might differ. We decline to award reasonable attorney fees to Susan.

An appeal is frivolous if we are convinced that it presents no debatable issues on which reasonable minds could differ and is so lacking in merit that there is no possibility of reversal. *In re Marriage of Foley*, 84 Wn. App. 839, 847, 930 P.2d 929 (1997). A civil appellant has a right to appeal under RAP 2.2, and all doubts as to whether the appeal is frivolous should be resolved in favor of the appellant. *See Streater v. White*, 26 Wn. App. 430, 434-35, 613 P.2d 187 (1980).

Here, Ian's arguments have questionable merit given the abuse of discretion and substantial evidence standards. On the other hand, the evaluation of the RCW 26.09.520 relocation factors is subjective and fact based. And Ian has some legitimate arguments that the evidence could have supported different findings. Therefore, we hold that Ian's appeal is not completely frivolous and we deny Susan's request for reasonable attorney fees.

No. 46525-6-II

We affirm the trial court.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, J.

We concur:

_____
BJORGEN, A.C.J.

_____
LEE, J.