IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | No. 38644-9-III |
| PATRICK CRAIN, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| SIRI PEARSON, fka SIRI CRAIN, | ) | |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, J.P.T.* — In March 2019, this court reversed a parental relocation decision that had erroneously applied the "Child Relocation Act" (CRA)[1] to parties who had entered into a substantially equal parenting plan. It directed Siri Pearson, if she wished to relocate, to pursue a modification. Shortly thereafter, the legislature amended the CRA so that it *did* apply to such parties, although differently than it applies to a parent with whom a child resides the majority of the time. At issue in this appeal are the results of the relocation retrial and a trial on a modification of the parenting plan that followed.

---

* Judge Laurel H. Siddoway was a member of the Court of Appeals at the time argument was held on this matter. She is now serving as a judge pro tempore of the court pursuant to RCW 2.06.150.

[1] RCW 26.09.405-.560.

We reject the argument on appeal that the trial court defied our mandate and the terms of a pretrial order in conducting the relocation retrial. We also conclude that while the parties presented conflicting evidence bearing on the relocation factors challenged by Mr. Crain, the trial court based its findings on substantial evidence that we do not reweigh.

The trial court committed legal error in the modification trial when it treated Ms. Pearson's requested modification as a minor modification under RCW 26.09.260(5), however, and the error is not harmless. We reverse the parenting plan entered in November 2021 and remand for a retrial of the requested modification of the parties' parenting plan.

## FACTUAL OVERVIEW AND PROCEDURAL BACKGROUND

Siri Pearson and Patrick Crain married in 2007. Together, they have one daughter, who is now 12 years old. We refer to her as "Mary," the pseudonym we adopted in the prior appeal. *See In re Marriage of Crain*, No. 35656-6-III (Wash. Ct. App. Mar. 12, 2019) (unpublished), http://www.courts.wa.gov/opinions/pdf/356566_unp.pdf.

The couple divorced in 2014. On separating, they entered into a parenting plan that spoke of Mary spending roughly equal time with each parent. Specifically, the plan provided:

> The child named in this parenting plan is scheduled to spend approximately equal time with her parents. Siri Crain shall be designated as the custodian of the child solely for purposes of all other state and federal statutes which

2

require a designation or determination of custody. This designation shall not affect either parent's rights and responsibilities under this parenting plan nor be construed against or in favor of either parent. . . . For purposes of the child support residential schedule credit, this designation does not infer or imply the mother to be the primary parent.

Clerk's Papers (CP) at 5.

Prior to school enrollment, the plan's residential schedule provided that Mary would spend a week with Mr. Crain from Sunday at 12:00 or 3:00 p.m. to Tuesday at 6:30 or 7:00 p.m. (with the earlier pickup time if Ms. Pearson was working), and the next week from Saturday at 3:00 p.m. to Tuesday at 6:30 or 7:00 p.m. By an oral modification, the parties agreed Mary would have an extra overnight stay with Mr. Crain every two weeks. The "School Schedule" section of the parenting plan stated:

Upon enrollment in school, the child shall reside with the Respondent, Siri Crain, except for the following days and times when the child will reside with or be with the other parent:

Reserved. The parties shall mediate the school schedule before [Mary] begins kindergarten if they are unable to reach an agreement.

CP at 2. The plan's holiday schedule provided that with the exception of Mother's and Father's Day, the parties would alternate most holidays with Mary, splitting time evenly on Thanksgiving, Christmas Eve and Day, and New Year's Eve and Day. Major decisions identified by the plan were to be made jointly.

For approximately two years, Ms. Pearson and Mr. Crain abided by this plan without issues. Their exchange of Mary was facilitated by their close proximity to one another: Mr. Crain lived in north Spokane with his new wife and their infant daughter,

3

Mary's half-sister, and Ms. Pearson lived in Elk, an unincorporated community in Spokane County.

Things changed when the home of Ms. Pearson's landlord and neighbor caught fire in December 2016. While Ms. Pearson's home was spared, a loss of power rendered it uninhabitable or at least considerably less habitable. Ms. Pearson moved into her boyfriend Brandon Reed's apartment in Hayden, Idaho. Mr. Crain only learned of the move when Mary told him in mid-January 2016 about sleeping on Mr. Reed's couch when she had residential time with her mother. After learning of Ms. Pearson's move, Mr. Crain filed an objection to relocation, prompting Ms. Pearson to renege on her earlier oral agreement to Mr. Crain's one additional overnight.

At the end of March 2017, Ms. Pearson responded to Mr. Crain's objection, disputing that she had failed to provide notice of a relocation and asserting that she initially stayed with Mr. Reed as a temporary measure. She asserted that she had only recently made the decision to relocate to Hayden, and asked the court to approve her relocation under the CRA.

A court commissioner dismissed both Ms. Pearson's motion for relocation and Mr. Crain's objection, citing *In re Marriage of Worthley*, 198 Wn. App. 419, 437, 393 P.3d 859 (2017), a then-new decision by Division Two of the Court of Appeals holding that the CRA does not apply to a relocation that would necessarily modify an existing joint and equal parenting plan to something other than joint and equal parenting. The

commissioner found that the parties' "agreed plan recognizes the parties intended shared/equal time with [Mary]," ruled that the plan modification provision applied, and ruled that an adequate cause hearing would be necessary. CP at 20-21.

On Ms. Pearson's motion for revision, the superior court reversed, ruling that the CRA *did* apply. In a two-day trial on the propriety of relocation, the same judge who heard the revision motion applied the CRA, treating Ms. Pearson as the person with whom the child resides a majority of the time. Under the CRA, then and now, a "person with whom [a] child resides a majority of the time" is afforded a presumption in favor of relocation. *See* RCW 26.09.430; and *compare* RCW 26.09.520 *and* RCW 26.09.525(1)(a).

The residential schedule was modified to provide that Mr. Crain would have residential time with Mary every other weekend. *Crain*, No. 35656-6-III, slip op. at 5. Mr. Crain has characterized the change as anywhere from an over-50 percent to a 65 percent reduction in what he contends was his intended residential time. The revised parenting plan retained the parties' joint decision-making authority.

*Prior appeal*

Mr. Crain appealed, and this court reversed. This court agreed with *Worthley* that the CRA does not apply to proposed relocations that would modify joint and equal residential plans to something other than joint and equal residential time. It endorsed *Worthley*'s reasoning:

5

"The high burden of adequate cause fulfills the policy to maintain the existing pattern of the parent-child relationship to protect the best interest of the child. The modification procedures were set up specifically to 'protect stability by making it more difficult to challenge the status quo.' *Parents who are parties to a joint parenting agreement have entered into a serious commitment to parent their children together. This commitment should not lightly be undone.* The modification statute protects the status quo in the parent-child relationship and that protection is no less important in the joint parenting context."

*Crain*, slip op. at 9 (quoting *Worthley*, 198 Wn. App. at 429-30).

Ms. Pearson had argued that as a factual matter, her and Mr. Crain's parenting plan did not provide for joint and equal parenting. This court disagreed. It held that Ms. Pearson's designation as custodian did not control, nor did precise proportional time, nor did her higher number of overnights. (Mr. Crain had been working graveyard shift at the time the 2014 plan was agreed.) It held that, instead, the court "look[s] to the parties' intent to share child rearing and spend nearly equal time with their child and the fulfillment of that intent," and observed that the parties' parenting plan "shows an intent to afford each parent 'approximately equal time' with Mary, and the two followed that intent until relocation." *Crain*, slip op. at 9-10. It reversed the trial court, dismissed the petition for relocation and invited Ms. Pearson, if she wished to live in Idaho, to file a petition to modify the plan and show adequate cause for modification. *Id.* at 10.

The mandate issued on April 18, 2019.

6

*Remand and statutory modification*

In April 2019, the Washington Legislature enacted Substitute Senate Bill (SSB) 5399, in response, in part, to *Marriage of Worthley*. *See* FINAL B. REP. ON SSB 5399, 66th Leg., Reg. Sess. at 2 (Wash. 2019). The final bill report characterized the legislation as making it clear that the CRA applies to *all* parenting plans, including those under which the parents have substantially equal residential time. *Id.* For parenting plans with substantially equal residential time, however, the presumption in RCW 26.09.520 favoring relocation would not apply. LAWS OF 2019, at § 1(1)(a) (codified at RCW 26.09.525(1)(a)). With respect to joint and equal plans, in determining whether to restrict a parent's right to relocate (or determining a modification based on the relocation), the court shall make a determination "in the best interests of the child[,] considering the [relocation] factors set forth in RCW 26.09.520." LAWS OF 2019, § 1(1)(b) (codified at RCW 26.09.525(1)(b)). "[S]ubstantially equal residential time" for this purpose was defined to "*include*[ ] arrangements in which forty-five percent or more of the child's residential time is spent with each parent," subject to some statutory guidance on determining the percentage. LAWS OF 2019, § 1(2) (codified at RCW 26.09.525(2)) (emphasis added).

Immediately following issuance of the mandate, Mr. Crain moved to reinstate the 2014 parenting plan. Ms. Pearson responded with a petition for a minor modification of

7

the plan that would approve relocation and incorporate the residential schedule the trial court had ordered prior to the appeal.

The court commissioner conducting the hearing on adequate cause for Ms. Pearson's motion for modification found adequate cause to conduct a full hearing. He expressed uncertainty as to whether the fact that Mary had already relocated to Idaho with her mother should be taken into consideration going forward. He perceived it as "very clear" that this court found that the 2014 parenting plan "was intended to be a 50/50 split. That both parties were to have 50 percent of the time, or as close there to [sic], I should say, as possible." CP at 144. He ordered the parties to engage in mediation "to try to find as close to a 50/50 plan as they possibly can." CP at 145.

Mediation proved unsuccessful. Following the July 28, 2019 effective date of the changes to the CRA, Ms. Pearson filed a new notice of intent to relocate. Mr. Crain again objected. He later filed a protective petition for a major modification of the parenting plan, seeking a change of the residential schedule and an order requiring Mary's enrollment in one of two school districts centrally located between the parties' residences.

Before trial, the superior court set a pretrial conference at Mr. Crain's request, for the purpose of simplifying issues created by the outcome of the prior appeal and the intervening change of the law. The pretrial conference was conducted by Judge Annette

Plese, who had not presided at the relocation trial and would not preside at the impending retrial. She entered a pretrial order establishing, among other matters, that

- The CRA as amended effective July 28, 2019 would apply;
- The Court of Appeals' findings that the 2014 final parenting plan created a substantially equal residential schedule for the parents and was binding on the parties and the court;
- The court could hear Mr. Crain's objection to relocation without a presumption in favor of relocation and without Ms. Pearson obtaining a finding of adequate cause for a major modification;
- The court would analyze Mr. Crain's objection to Ms. Pearson's request for relocation based on the best interest of the child considering the factors set forth in RCW 26.09.520 and RCW 26.09.002;
- "The Court will address the school schedule for the child and all other necessary aspects of the parenting plan after analyzing the request for (and objection to) relocation, with evidence limited to that presented at [the] time of trial w[ith] Judge [Harold] Clarke," who had presided at the 2017 trial, CP at 242; and
- The court would analyze the CRA factors as if the relocation was not granted at the 2017 trial, and the evidence would be limited to the evidence presented at that trial.

A few months later, Judge Plese entered a summer residential schedule that provided the parents with equal residential time.

Trial was continued following entry of the pretrial order. The retrial of relocation took place in September 2020, before the original trial judge. The parties agreed to submit the matter to the court based on the transcript of the 2017 trial and the pretrial order entered by Judge Plese. The court also reviewed new trial briefs filed by both parties.

9

The trial court said it was abiding by the pretrial order, but expressed mild

frustration with this court and Judge Plese:

> There are two problems . . . with the position this Court finds itself in.
> First, the Court heard testimony and made a finding as to the time the child
> spent with each parent. No court has since done a calculation under the law
> as it exists, rather, the Court of Appeals drew conclusions based on
> language in the original Parenting Plan and a counting of time that ignored
> overnights [nine (9) with Ms. Pearson, five (5) with Mr. Crain] and
> included any part of day as a whole day, ultimately holding substantial time
> with a parent was equal time. The actual testimony at trial (Mr. Crain at
> Page 182 of the transcript) does not support that. Each court looking at the
> matter has followed the Court of Appeals' position. Second, this review
> will necessarily ignore what has transpired over the last three (3) years.
> Whether this approach is fair to either or both of the parties is an open
> question.

CP at 307-08 (alteration in original).

In a six-page decision, the trial court explained its application of the 10 relevant

statutory relocation factors, finding that all were either neutral or favored relocation. It

ruled that Ms. Pearson could relocate. In a letter to the parties a few weeks later, the trial

court notified them of its position that the Court of Appeals' decision had rendered its

2017 parenting plan void, and because Judge Plese's order setting the summer 2020

schedule had expired, it viewed the 2014 plan as the operative plan until further order of

the court. Shortly thereafter, a court commissioner signed a temporary parenting plan

reviving Mr. Crain's right to residential time every other weekend.

Mr. Crain moved for discretionary review of the relocation decision, which was

denied.

The same trial court presided at a one-day trial on modification of the residential schedule in November 2021. There was some debate over whether it should be tried as a minor modification, with Mr. Crain arguing unsuccessfully that RCW 26.09.260(6), rather than the minor modification procedure, applied. In an unreported hearing taking place the week before the trial, the trial court evidently ruled that it would honor Ms. Pearson's position, in moving for modification in May 2019, that she was seeking a minor modification. It was her position that since the 2014 final parenting plan "reserved" the issue of Mr. Crain's residential time once Mary enrolled in school, he presently had no residential time under the plan, and the court could afford Mr. Crain no more than 90 overnights without violating RCW 26.09.260(5)(c). As protested by Mr. Crain, this treated the "reservation" of a school schedule as affording him "'zero' visitation." CP at 388.

At the outset of the modification trial, the trial court reaffirmed that it would follow the minor modification procedure. It later sustained an objection when Mr. Crain's lawyer asked Ms. Pearson about any objection she had to Mr. Crain having more than 90 overnights, ruling that her position on that score was not relevant.

Ms. Pearson testified at the trial that Mary, by then a fourth-grader, continued to attend school in Idaho. She had recently been reassigned from one public school, Hayden Meadows, to another, Northwest Expedition Academy, as a result of a zoning change. Ms. Pearson admitted that on occasion Mary brought up issues of the parenting plan with

her, but said she redirected her when such issues came up. She testified that Mr. Crain believed Mary should be included in conversations about the parenting plan and openly discussed such issues with her, including, most recently, Mary's apparent desire to attend a private Christian school halfway between the parties' homes. Ms. Pearson believed that neither she nor Mr. Crain could afford the more centrally located private schools and she did not like the idea of Mary spending that much car travel time every day.

Ms. Pearson thought it important that Mary attend a school close to home in Idaho so she could continue to see her friends and so Ms. Pearson could easily pick her up in the event of an emergency. Asked on cross-examination whether she was open to any centrally-located school, perhaps one closer to her, Ms. Pearson said that if it was a public school, "[Y]ou would have the same sort of issues as we had with Hayden Meadows. If she does get choiced in there, she could always be kicked out." 1 Rep. of Proc. (RP) at 44.[2] She also pointed out that Mr. Crain had moved around Spokane during the proceedings without trying to move closer to Idaho. She testified that she would be comfortable with Mr. Crain having an extra overnight on Sundays during his every-other-weekend visitation in light of Mary's school's late start schedule on Mondays. In response to a question from her own lawyer, she testified that she was comfortable with

---

[2] Citations to 1 RP refer to the modification hearing held on November 15, 2021. Citations to 2 RP refer to the single, consolidated volume of hearings on relocation held on August 14 and 15, 2017.

that adjustment even if it would take Mr. Crain slightly over 90 overnights in a calendar year.

Mr. Crain testified that he did not believe the 2014 parenting plan's reserved school schedule was intended to prejudice him by reducing his residential time. He wanted the court to order that Mary be enrolled in one of two private academies located between the parties' homes. He thought that for Mary to transfer schools would not be disruptive, given her recent move from Hayden Meadows to Northwest Expedition. He offered to pay a disproportionate share of tuition for private school if it meant he could see Mary more often during the week, and agreed with testimony from Ms. Pearson that the main limitation on mid-week visitation was distance. He testified that Mary experienced anxiety and distress when she was away from him for long periods of time and often phoned him during school hours when she was upset. Even if transfer to a more central school was not ordered, he sought at least one additional weekend a month.

The trial court took the matter under advisement and signed a letter opinion and final order two days later. Ms. Pearson was designated as the custodian and the agreed language from the 2014 plan that "the child . . . is scheduled to spend approximately equal time with her parents" was struck. *Compare* CP at 5, *with* CP at 486. The new residential schedule closely adhered to the temporary schedule in place at the time of trial: Mr. Crain received every other weekend with Mary, but with an additional overnight on Sundays in light of her late start schedule on Mondays. The parties were to

13

evenly split time over summer and winter break, with holidays to go to the parent with the adjoining weekend, with the exceptions of Mother's and Father's Days, and of Thanksgiving, Christmas, New Year's, the Fourth of July, and Mary's birthday, which would rotate. The parties continued to share joint decision-making authority over major issues.

Mr. Crain timely appealed the final parenting plan and letter opinion.

ANALYSIS

Mr. Crain makes a dozen assignments of error. Three are to the trial court's alleged failure in the relocation retrial to abide by the mandate and/or follow terms of Judge Plese's pretrial order. Seven are to the trial court's weighing in the relocation retrial of the 10 applicable relocation factors provided by RCW 26.09.520. Two are to conducting the modification trial as if it were a minor modification, in which the court could afford Mr. Crain no more than 90 overnights.[3]

We first address the challenge to the conduct of the modification hearing, which is the only basis on which we reverse. We then turn to the remaining issues.

---

[3] Mr. Crain also asked in his opening brief that we direct the superior court to assign a different judge to the matter on remand, asserting that no disinterested observer would believe that he could get a fair trial before the trial judge who has heard the prior trials. Ms. Pearson disagreed in her response, but also pointed out that the trial judge who presided in the challenged proceedings had since retired. Mr. Crain agrees in his reply that the issue is moot. There is no need for us to address the issue.

I.      ERRONEOUS PROCEDURE WAS FOLLOWED IN THE MODIFICATION TRIAL, AND IT
        WAS NOT HARMLESS

We first address Mr. Crain's assignments of error to the trial court's conduct of the

modification trial under the procedure applicable to a minor modification, with the

related ruling that Mr. Crain would be limited to residential time not exceeding 90

overnights.  (Assignment of Error Nos. 3 and 5.)

We review a trial court's decision concerning the welfare of children for an abuse

of discretion.  *In re Marriage of Horner*, 151 Wn.2d 884, 893, 93 P.3d 124 (2004).  The

trial court abuses its discretion when its decision is "'manifestly unreasonable or based

on untenable grounds or reasons.'"  *Shrauner v. Olsen*, 16 Wn. App. 2d 384, 401, 483

P.3d 815 (2020) (internal quotation marks omitted) (quoting *In re Marriage of Katare*,

175 Wn.2d 23, 25, 283 P.3d 546 (2012).

> A court's decision is manifestly unreasonable if it is outside the
> range of acceptable choices, given the facts and the applicable legal
> standard; it is based on untenable grounds if the factual findings are
> unsupported by the record; it is based on untenable reasons if it is based
> on an incorrect standard or the facts do not meet the requirements of the
> correct standard.

*In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997).

RCW 26.09.260 provides the bases on which a party may seek modification of a

parenting plan.  Subsection (1) of the statute deals with major modifications, and

provides that a court may not make such a modification unless it finds that "a substantial

change has occurred in the circumstances of the child or the nonmoving party and that the

15

modification is in the best interest of the child and is necessary to serve the best interests

of the child." In addition, the petitioner must show one of four other circumstances

involving the parents or the child, identified in RCW 26.09.260(2)(a)-(d).

For minor modifications to the residential schedule, RCW 26.09.260(5) establishes

more relaxed requirements. *In re Marriage of Tomsovic*, 118 Wn. App. 96, 104, 74 P.3d

692 (2003). A petitioner seeking a minor modification need only show a substantial

change in the circumstances of either parent or child. RCW 26.09.260(5). The petitioner

is not required to demonstrate one of the factors under RCW 26.09.260(2) as long as the

proposed modification "does not change the residence the child is scheduled to reside in

the majority of time," and, as relevant to the modification trial below, either:

> (a) Does not exceed twenty-four full days in a calendar year; or
>
> . . . .
>
> (c) *Does not result in a schedule that exceeds ninety overnights per year in total*, if the court finds that, at the time the petition for modification is filed, the decree of dissolution or parenting plan does not provide reasonable time with the parent with whom the child does not reside a majority of the time, and further, the court finds that it is in the best interests of the child to increase residential time with the parent in excess of the residential time period in (a) of this subsection.

RCW 26.09.260(5)(a), (c) (emphasis added). A party relying on RCW 26.09.260(5)(c) is

subject to additional requirements if the party was granted a modification under the same

subsection within the prior 24 months.

16

When a party serves notice of relocation and a proposed revised parenting plan under the CRA, a third subsection of the modification statute applies: RCW 26.09.260(6). *McDevitt v. Davis*, 181 Wn. App. 765, 770-71, 326 P.3d 865, *review denied*, 181 Wn.2d 1018 (2014); *In re Marriage of Laidlaw*, 2 Wn. App. 2d 381, 388, 409 P.3d 1184, *review denied*, 190 Wn.2d 1022 (2018). In such cases, RCW 26.09.260(1), (2), and (5) *do not* apply. *In re Marriage of Raskob*, 183 Wn. App. 503, 513-15 & nn.15, 17, 334 P.3d 30 (2014).

RCW 26.09.260(6) provides:

*The court may order adjustments to the residential aspects of a parenting plan pursuant to a proceeding to permit or restrain a relocation of the child.* The person objecting to the relocation of the child or the relocating person's proposed revised residential schedule may file a petition to modify the parenting plan, including a change of the residence in which the child resides the majority of the time, without a showing of adequate cause other than the proposed relocation itself. A hearing to determine adequate cause for modification shall not be required so long as the request for relocation of the child is being pursued. *In making a determination of a modification . . . the court shall first determine whether to permit or restrain the relocation of the child . . . . Following that determination, the court shall determine what modification pursuant to relocation should be made, if any, to the parenting plan or custody order or visitation order.*

(Emphasis added.)

Ms. Pearson's motion for modification was filed in May 2019, before the effective date of SSB 5399, so the CRA did not yet apply. A motion for modification was the appropriate procedure. But it would have been error for the court to proceed on Ms. Pearson's theory that under the "reserved" school residential schedule, Mr. Crain should

17

be treated as having no right to residential time, and an ability to obtain, at most, 90 overnights. This is a wholly unwarranted construction of the reservation.

Washington decisions have recognized that delaying finality may be a tenable exercise of discretion, and thus courts and parties are permitted to defer permanent decision-making with respect to parenting plans for a specified period of time. *In re Marriage of Rounds*, 4 Wn. App. 2d 801, 805-06, 423 P.3d 895 (2018); *and see In re Marriage of Possinger*, 105 Wn. App. 326, 336-37, 19 P.3d 1109 (2001); *In re Marriage of True*, 104 Wn. App. 291, 298, 16 P.3d 646 (2000); *In re Marriage of Adler*, 131 Wn. App. 717, 724-25, 129 P.3d 293 (2006) (reservation agreed by parties). The tenable exercise of discretion is in taking a wait and see approach to how a residential schedule is working out. *Rounds*, 4 Wn. App. 2d at 806. Had the CRA not been amended, the trial court could have accelerated the determination of a school schedule for Mary presuming no relocation, or arrived at a deemed school schedule (presuming no relocation) based on this court's decision on the intent of the parties. From that, it could determine whether Ms. Pearson's proposed schedule was a minor or major modification. Proceeding on the basis of a fiction that Mr. Crain had no right to residential time would have been an improper approach, however.

In any event, once SSB 5399 became effective, the procedure for approval of relocation was that provided by the CRA, with RCW 26.09.260(6) now serving as the procedure for any related modification of the parenting plan. As provided by RCW

26.09.525(1)(b), "in determining a modification of [the parenting plan] based on the proposed relocation, the court shall make a determination in the best interests of the child considering the factors set forth in RCW 26.09.520."

The trial court erred by conducting the modification trial under RCW 26.09.260(5) and imposing a cap of 90 overnights on Mr. Crain, affording him only the few additional overnights agreed to by Ms. Pearson. It was a completely unwarranted cap, and not harmless. Remand is required for a new modification trial.

Although the same relocation factors are considered in making the relocation and modification decisions, RCW 26.09.260(6) does not contemplate that the analysis of the factors in making the relocation decision controls "what modification pursuant to relocation should be made, if any, to the parenting plan." The statute contemplates a second, separate determination.

II. NO DEFIANCE OF OUR MANDATE OR FAILURE TO ABIDE BY THE PRETRIAL ORDER IS DEMONSTRATED

Mr. Crain also challenges the outcome of the relocation retrial, contending first that in conducting the retrial, the trial court defied this court's mandate and/or disregarded terms of the pretrial order in three respects:

- by disregarding this court's conclusion "that the parties shared equal time with the child under [the] final parenting plan entered [in] 2014," Appellant's Br. at 3;
- by making a de facto presumption in favor of relocation, contrary to the mandate and the pretrial order; and

- by ignoring the conclusion of the pretrial order that the relocation decision must be analyzed as if Ms. Pearson had not relocated with Mary.

Appellant's Br. at 3-4 (Assignment of Error Nos. 1, 2 and 4).

Upon issuance of the mandate by this court, "the action taken or decision made . . . is effective and binding on the parties to the review and governs all subsequent proceedings in the action in any court, unless otherwise directed upon recall of the mandate." RAP 12.2. The appellate court's decision becomes the law of the case and supersedes the trial court's findings on every issue that the appellate court decided. *State v. Strauss*, 119 Wn.2d 401, 412, 832 P.2d 78 (1992).

On the motion of Mr. Crain, Judge Plese was authorized by CR 16(a)(1) to conduct a conference to consider the simplification of the issues and such other matters as might aid in the disposition of the matter. A pretrial order, once entered, "controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice." CR 16(b). The general rule is that new theories will not be entertained after the parties have entered into pretrial conference and a pretrial order has been issued as a result. *Esmieu v. Schrag*, 92 Wn.2d 535, 537, 598 P.2d 1366 (1979). The pretrial order was never modified at the relocation retrial.

Mr. Crain's allegation that the trial court defied our mandate or the pretrial order reprises arguments he made when he sought the discretionary review that our

commissioner denied in January 2021.  Mr. Crain moved to modify our commissioner's

denial of discretionary review, and that motion was denied by a panel of judges.

In support of these alleged errors, Mr. Crain argues that the trial court persisted in

its view that the number of overnights meant that Ms. Pearson was "a person with whom

the child resides a majority of the time"; that in approaching the relocation factors, the

trial court adopted the position that Ms. Pearson was Mary's "primary parent"; and that

the court improperly characterized Ms. Pearson as having the strongest relationship with

Mary in its best interests analysis.  In his reply brief, Mr. Crain asserts that the "most

glaring" evidence, Appellant's Reply Br. at 10, of the trial court's application of a de

facto presumption is that when it analyzed the first, "relative strength of relationship"

relocation factor[4] in 2017, it concluded that Mary was equally bonded to both parents, yet

when considering the same evidence without a presumption at the retrial, it found that

Ms. Pearson had the strongest relationship to Mary.  He argues that the same thing

occurred when the trial court analyzed the seventh, "quality of life" factor.[5]

Mr. Crain points to the frustration with this court and Judge Plese that the trial

court expressed in its letter opinion, which Mr. Crain argues "disregarded and overruled

---

[4] "The relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life."  RCW 26.09.520(1).

[5] "The quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations."  RCW 26.09.520(7).

the Appellate Court's mandate." Appellant's Br. at 13. He emphasizes the trial court's

statements that "'the Court of Appeals . . . ignored overnights . . . and included any part

of [a] day as a whole day, ultimately holding substantial time with a parent was equal

time,'" and, "The actual testimony at trial . . . does not support that." *Id.* (emphasis

omitted) (quoting CP at 307-08). Contrary to the trial court's complaint, the appellate

panel exhibited a correct understanding of the schedule.[6] It merely rejected the number

of overnights as the best test of whether the parenting plan called for substantially equal

residential time. Contrary to the trial court's assertion, the testimony at the trial supports

this court's statements about the residential schedule.[7]

Mr. Crain demonstrates that the trial court expressed mistaken disagreement with

this court's decision, but that does not demonstrate that it *defied* this court's decision. As

our commissioner held in rejecting this contention as a basis for discretionary review,

"[a] fair reading of the trial court's *Final Order* (and *Memorandum Opinion* incorporated

into it) does not support Mr. Crain's contentions." Comm'r's Ruling, *In re Marriage of*

---

[6] This court stated: "[O]ver a two-week period, Mary spent seven days with her father and seven days with her mother. . . . If measured by overnight stays, Patrick's . . . overnight residences [resulted in] a total of five overnight stays in a fourteen-day time period. Siri enjoyed nine of fourteen overnight stays. In April 2016, Patrick and Siri Crain orally agreed to modify the parenting plan to add an extra overnight stay for Mary with her father every two weeks." CP at 56.

[7] The testimony at 2 RP at 182, cited by the trial court, states that Mr. Crain received six out of eight overnights with Mary by oral agreement and also confirms that under the 2014 agreements "[t]he parties . . . [were] scheduled to spend approximately equal time with [Mary]."

*Crain*, No. 37797-1-III, at 6 (Wash. Ct. App. Jan. 15, 2021) (on file with court).  The record persuades us that the trial court intended to follow our decision, and was only venting.  Its written decision stated, "Each court looking at the matter has followed the Court of Appeals' opinion," and affirmed that its decision was based on the 2017 trial materials, Judge Plese's CR 16(b) order, and "the Court of Appeal[s'] opinion filed March 12, 2019."  CP at 308.  Judicial officers are not forbidden from questioning a higher court's decision as long as they abide by it.

As for Mr. Crain's claim that the trial court deemed Ms. Pearson the "primary parent" in approaching analysis of the relocation factors, this contention was also rejected by our commissioner when Mr. Crain moved for discretionary review.  As our commissioner pointed out, "the trial court did not *find* Ms. Pearson to be the child's primary parent," instead, "it *found* that Ms. Pearson testified she was the primary parent."  Comm'r's Ruling, *Crain*, No. 37797-1-III, at 7.  The trial court did find, "[b]ased on the testimony at trial," that "Ms. Pearson has the greatest involvement in [Mary]'s life up to the time of trial, and she has the strongest relationship with her."  CP at 308.  But it did so in assessing the "relative strength of relationship" relocation factor, which RCW 26.09.525(1)(b) required the court to do.

Our commissioner rejected Mr. Crain's contention that error was demonstrated by the fact that the trial court's findings on the relocation factors following the retrial were not identical to its findings on the factors in 2017.  As the commissioner pointed out, Mr.

23

Crain cited no legal authority that the court was bound by its earlier findings. Comm'r's Ruling, *Crain*, No. 37797-1-III, at 7. Mr. Crain persists in arguing that in changing its findings the trial court was applying a de facto presumption in Ms. Pearson's favor, but he still provides no authority. We find it unsurprising, and perhaps to be expected, that with an appellate decision, new trial briefs, a new pretrial order, and the 2017 transcript in mind, the trial court might identify different testimony and couch its findings in different terms. We will affirm the court's findings following the relocation retrial if they are supported by substantial evidence, the issue we address in section III.

Finally, Mr. Crain takes issue with the fact that the court's "best interests" analysis characterized Ms. Pearson as having "the most significant relationship" with Mary, CP at 311, which he argues is contrary to the trial court's obligation to recognize him as a parent this court determined was scheduled to receive approximately equal residential time. Yet the first and the third relocation factors[8] both require the court to consider the relative strength of the child's relationship to her parents in determining whether relocation will be in the child's best interests. It does not follow from the fact that a parenting plan provides for substantially equal residential time that a child's relationships with her parents will be equally strong.

---

[8] The third relocation factor asks "Whether disrupting the contact between the child and the person seeking relocation would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation." RCW 26.09.520(3). For the first factor see n.6, *supra*.

Mr. Crain fails to demonstrate that the trial court defied this court's mandate or Judge Plese's pretrial order.

III.    SUBSTANTIAL EVIDENCE SUPPORTS THE TRIAL COURT'S FINDINGS

Mr. Crain assigns error to the trial court's findings on seven of the relocation factors. The factors are set forth in RCW 26.09.520, and the trial court must consider all of them, even though some may not apply. *Horner*, 151 Wn.2d at 894. The statute explicitly provides that the factors "are not weighted," and that "[n]o inference is to be drawn from the order in which the[y] . . . are listed." RCW 26.09.520. "Ideally, trial courts will enter findings of fact on each factor." *Horner*, 151 Wn.2d at 895. If not, we review whether substantial evidence was presented on each, and whether the trial court's findings and oral articulations demonstrate that each factor was nonetheless considered. *Id.* at 896.

Challenged findings of fact are reviewed for substantial evidence. *In re Marriage of Weaver*, 20 Wn. App. 2d 388, 413, 505 P.3d 560 (2021. A finding of fact is supported by substantial evidence where the record contains a sufficient quantity of evidence to persuade a rational, fair-minded person of the truth of the declared premise. *Id.* We "do[ ] not reweigh the evidence or disturb a trial court's determination regarding the credibility of witnesses." *Shrauner*, 16 Wn. App. 2d at 402. The party challenging the finding of fact bears the burden of demonstrating a lack of substantial evidence. *Id.*

Where the person proposing to relocate is the person with whom the child resides a majority of the time, the party objecting to relocation may rebut the presumption in favor of relocation by demonstrating that the detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating parent based on the factors. This court has pointed out that "[p]resumably the superior court must grant the motion . . . if all eleven factors favor a move in residence" and "deny the motion if all eleven factors disfavor relocation," but, "No case discusses how to count or weigh the various factors when some favor and others disfavor relocation." *Weaver*, 20 Wn. App. 2d at 412. Where the presumption operates, courts can base their relocation decisions on whether a majority of factors tip in favor of the party proposing or advocating against relocation, because any factor that applies will either favor or disfavor relocation, given the presumption. *Id.* at 423 (most factors favored denying the motion). When a party is entitled to the presumption in favor of relocation, "a factor which does not operate to rebut the presumption [i.e., a neutral factor] generally favors relocation." *Id.* at 416.

Where, as here, the person proposing relocation has substantially equal residential time, the court determines whether to restrict the right to relocate "in the best interests of the child[,] considering the factors." RCW 26.09.525(1)(b). The CRA provides no direction on how to determine a child's best interests when a few of the relocation factors favor relocation but most of the factors are neutral. Mr. Crain persuaded Judge Plese to provide in the pretrial order that best interest would be determined "considering the

26

factors set forth in RCW 26.09.520 and RCW 26.09.002." CP at 241. The latter

provision, a statement of legislative policy, provides in part that "the relationship between

the child and each parent should be fostered unless inconsistent with the child's best

interests," and "the best interest of the child is ordinarily served when the existing pattern

of interaction between a parent and child is altered only to the extent necessitated by the

changed relationship of the parents or as required to protect the child from physical,

mental, or emotional harm."

We turn to the challenged factors in the order they appear in RCW 26.09.520.

> *Factor 1: The relative strength, nature, quality, extent of involvement, and*
> *stability of the child's relationship with each parent, siblings, and other*
> *significant persons in the child's life* (Assignment of Error No. 6)

The trial court found that this factor favors Ms. Pearson.

Mr. Crain argues that when Ms. Pearson relocated to Idaho in 2017, "every

significant person in [Mary]'s life (including Ms. Pearson's own family) was in the north

Spokane area[,] where the father continued to reside," and he cites supporting testimony.

Appellant's Br. at 50 (some emphasis omitted). He argues that "[t]he only person known

to [Mary] in the Idaho area (as stated by Ms. Pearson) was the mother's boyfriend of <u>four</u>

<u>months</u>, Brandon Reed," and he cites partially supporting testimony—partially, because

the testimony he cites establishes that Ms. Pearson had been involved with Mr. Reed for

four months before *the December 2016 fire*, not the relocation. *Id.* at 49. Mr. Crain

points out that the trial court's analysis of this factor in its letter opinion in 2017 stated:

27

> The child has a good relationship with each party as well as other
> significant persons in the child's life such as Mr. Crain's spouse, his
> family and Ms. Crain's family, all of whom reside in the Spokane area.
> [Mary] is bonded to her parents, and there are strong emotional ties to
> each.

CP at 25-26.

The trial court's lengthier analysis of this factor in its 2020 decision echoes the reasons given in 2017, but adds the observations that "Ms. Pearson testified her boyfriend and his children had a relationship with [Mary]," and "Ms. Pearson testified she had the strongest relationship, due to her being [Mary]'s primary parent." CP at 308. The evidence supports the finding that this testimony was presented at trial. Although a different judge might have weighed the testimony differently, it is implicit in the findings that the trial judge found Ms. Pearson's testimony that she had the strongest relationship to be credible. *See* CP at 308 ("Based on the testimony at trial, Ms. Pearson has the greatest involvement . . . and she has the strongest relationship."). We do not reweigh the trial court's weighing of the evidence. *In re Marriage of Kim*, 179 Wn. App. 232, 245, 317 P.3d 555 (2014).

Also bearing on the trial court's analysis of this factor is the following consideration, which it identified as "important . . . to this court":

> This Court notes that the proposed relocation places the parties
> approximately forty (40) miles apart, with driving time of approximately
> one (1) hour. While it is always preferred to have individuals who are co-
> parenting live within a few minutes of each other, the proposed relocation
> here does not involve the parties living hundreds of miles apart with

28

> significant travel time. The distance in this case allows all affected individuals to maintain relationships with [Mary], *an important outcome to this Court.*

CP at 308 (emphasis added). We note that this discussion is irrelevant. A court can commit legal error by relying on findings that are irrelevant to the factor at issue. *Shrauner*, 16 Wn. App. 2d at 405-07.

After considering the relocation factors, the court is charged by the CRA with "mak[ing] a determination in the best interests of the child[,] considering the factors." RCW 26.09.525(1)(b). We see no reason why the trial court could not, at that stage of the analysis, deem the relatively short cross-border distance to be relevant, but trial courts should avoid modifying the factors identified by the legislature with ancillary considerations of their own.

> *Factor 3: Whether disrupting the contact between the child and the person seeking relocation would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation* (Assignment of Error No. 7)

The trial court found that this factor favors Ms. Pearson, stating:

> Ms. Pearson was the only one testifying on this point. She stated it would be more detrimental to disrupt the contact between [Mary] and herself. This was not disputed by Mr. Crain, nor did he testify to this point.

CP at 309. The court added that it agreed with Ms. Pearson's testimony based on its determination that she had the stronger relationship with Mary. *Id.*

29

Mr. Crain argues that Ms. Pearson failed to explain "how the relocation . . . would best maintain [Mary]'s emotional growth, health and stability, and physical care," but those are not the considerations identified by this factor. Appellant's Br. at 52. Ms. Pearson did testify:

> Q.     Would it be disruptive for [Mary] to spend less time with her father, in your opinion?
>
> A.     Not so much as it would be disruptive for her to spend less time with me. She'll have to adjust to the new schedule, but I've always been her primary parent. And it will be less (sic) disruptive for her to spend less time with me.

2 RP at 205.

Mr. Crain acknowledges that he did not "use the words 'disrupting [. . .] contact' in his testimony.'" Appellant's Br. at 52. We identified one point in the transcript of the 2017 trial at which Mr. Crain's lawyer asked him if he had laid out his thoughts on disruption in a declaration, and Mr. Crain answered, "That's correct." 2 RP at 133. That was the extent of his testimony about the impact of "disrupting . . . contact." *Id.* The declaration was not offered as an exhibit at the trial. Mr. Crain argues that he did testify to his involvement in Mary's life and his commitment to parenting, but he does not point out particular testimony on those matters that the trial court should have perceived as addressing this disruption factor.

The trial court's observation that only Ms. Pearson addressed the disruption factor is supported by the evidence.

30

> *Factor 5: The reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation*

The trial court found that this factor does not weigh in either party's favor. Mr. Crain contends the trial court should have found this factor to disfavor relocation.

The trial court found in 2017 that Ms. Pearson and Mr. Crain both had good faith reasons for their positions, and made a similar finding, though more fully explained, following the retrial. Following the retrial, it found that Mr. Crain had not accused Ms. Pearson of bad faith at the 2017 trial.

Mr. Crain attaches unwarranted importance to several background facts recounted in this court's 2019 opinion, as if they reflect appellate findings that Ms. Pearson acted in bad faith. They do not reflect appellate findings that Ms. Pearson acted in bad faith.

He also argues that Ms. Pearson's relocation "is rendered more suspect when considering the messages sent by Ms. Pearson to [Mary]'s pre-school teacher." Appellant's Br. at 54. The message he points to is a text message sent by Ms. Pearson after the teacher contacted Ms. Pearson's mother about Ms. Pearson being delinquent in her tuition payments; Mr. Crain cites her statement, "'There is absolutely no way that I'm going to pay you to disparage me and submit false information on court documents. Also, trying to help my daughter's sociopath of a dad get custody of her.'" *Id.* (emphasis omitted) (quoting 2 RP at 102). We are unable to determine whether this testimony was argued as evidence of bad faith at the 2017 trial, because we do not have the parties'

closing arguments or trial briefs, if any were filed. It *is* an argument made in Mr. Crain's 2020 trial brief.

Ms. Pearson responded in her 2020 trial brief that she testified at the 2017 trial to her good faith for relocating: she wanted to relocate Mary to Idaho because it was "the best place for them, with the support of Mr. Reed and her family, in a nice home with good schools." CP at 300 (citing 2 RP at 206). Ms. Pearson also argued that Mr. Crain did not question her good faith when given an opportunity to do so at trial. *Id.* (citing 2 RP 174).[9]

Ms. Pearson's testimony about her reason for relocating is substantial evidence on which the trial court could rely in finding good faith on her part. It invades the province of the trial court for us to find that the preschool teacher's evidence is compelling evidence of bad faith where the trial court did not find it compelling. *Quinn v. Cherry Lane Auto Plaza, Inc.*, 153 Wn. App. 710, 717, 225 P.3d 266 (2009).[10]

---

[9] Q.    And you're objecting in good faith because you don't want [Mary] to move to Idaho?
A.    No. I do not.
Q.    Do you understand she feels she's acting in good faith because she believes [Mary] should reside with her?
A.    I would hope that she would have good faith.

2 RP at 174.

[10] The court made an additional finding that was not relevant:

It should be noted the existing Parenting Plan (entered 3/31/14) reserved the school schedule . . . for later determination. The parties would be engaged in some process at this time if they could not agree as to the school

> *Factor 7: The quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations*

The trial court found that the seventh factor weighed in Ms. Pearson's favor. It explained:

> Ms. Pearson testified the resources and opportunities for herself and [Mary] were better in Hayden, Idaho[,] than Elk, Washington. This included her research into school performance in relation to state standards, which she testified was better at the proposed school in Hayden than the school near Mr. Crain. Ms. Pearson testified her economic opportunities were better in Hayden. Mr. Crain did not dispute Ms. Pearson's testimony . . . except to point out he lived in a good neighborhood and had a school close by.

CP at 310.

Mr. Crain argues on appeal that "[t]here was no evidence presented suggesting Ms. Pearson has an increased quality of life, resources, or opportunities available in Idaho," and that here, too, the court entered new and different findings from those entered in 2017. In 2017, it merely observed that there was no evidence Mary would suffer a loss of quality of life, resources or opportunities from the move. Appellant's Br. at 57, 59.

---

> schedule, which they cannot. The parties would have been in front of the court in a different manner, but nonetheless would have been litigating the Parenting Plan in any event.

> It is also worth noting the existing plan indicates [Mary] will reside with Ms. Pearson, with Mr. Crain's time to be determined if it could not be agreed upon as noted above.

CP at 309.

Again, the fact that the findings following the retrial are different is irrelevant; the question is whether they are supported by the evidence.

Ms. Pearson testified at trial that she had easier access to supplies and employment in Coeur d'Alene than in Elk, and she and Mary were living in a newer, nicer home. On the issue of resources, her lawyer also elicited her agreement with earlier testimony from Mr. Crain, who had said, "Elk is kind of deep out in the country. There is not a lot of resources there. I mean, there is not a lot of anything there. It's—go to Deer Park or go to Spokane." 2 RP at 173. As found by the trial court, Ms. Pearson testified to a higher quality of schools in Coeur d'Alene, and testified that she was much closer to a hospital. She projected that she would derive more income from her upholstery work following the move.

Mr. Crain argues that because "the extended family is a resource in [Mary's] emotional development," this factor "should weigh heavily" in favor of Mary remaining in Washington. Appellant's Br. at 59-60. This argument distorts the substance of the seventh factor, however, and was appropriately addressed to the first factor.

The trial court's finding is supported by substantial evidence.

> *Factor 8: The availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent*

The trial court found, as to the eighth factor, "There was little discussion on this point at trial, except to acknowledge [Mary] can use the phone and Skype or a similar

34

[I]nternet access could be used in the future." CP at 310. It cannot be discerned with certainty whether the trial court viewed this factor as neutral or as favoring Ms. Pearson, but since the court tended to be explicit about factors that favored Ms. Pearson, we assume it was deemed neutral. It is clear elsewhere in the opinion that it was not viewed as favoring Mr. Crain. *See* CP at 311 (stating that all of the factors were either neutral or favored relocation).

Mr. Crain argues that it was error not to find this factor as weighing against relocation. He argues that "[t]here will be (and has been) a substantial loss to Mr. Crain's parenting time with [Mary]," and it "cannot be adequately mitigated by Skype or phone contact." Appellant's Br. at 61. We accept the proposition that for Mr. Crain, residential time is the optimal means of fostering a parent-child relationship and access, but that is not the issue. There was no evidence at trial that alternative arrangements were *not* available. There was some evidence that they were available and were being used.

It was error for the trial court to fail to identify whether it viewed this factor as neutral or favoring Ms. Pearson. But substantial evidence supports the finding that Mary is capable of using alternate communication platforms, and will be able to use them in the future.

> *Factor 9: The alternatives to relocation and whether it is feasible and desirable for the other party to relocate also*

The trial court found, as to the ninth factor:

35

> Mr. Crain testified he intended to pursue a career in real estate in Washington[,] and did not want to pay Idaho income taxes. Ms. Pearson testified she could not remain in Elk, as her home did not have electrical power.
>
> It is not feasible for Mr. Crain to move. And there were no stated alternatives for Ms. Pearson.

CP at 310.

Mr. Crain argues that this factor should have disfavored relocation, because Ms. Pearson had many alternatives that would have kept her in the Elk area, whereas it is not desirable or feasible for him to relocate to the Coeur d'Alene area. He applies a striking double standard, assessing what was *desirable or feasible* for him, versus what was *humanly possible* for Ms. Pearson.

In the trial testimony that he cites, Ms. Pearson stated that after the December 2016 fire, (1) her landlord's homeowner's insurance provided the landlord with a trailer and a generator in which the landlord's family could live, but she had renter's insurance, not homeowner's insurance, which did not provide the same coverage; (2) she did not "ask for a generator," 2 RP at 31, because she would not have been able to power her rented house with a generator; (3) she did not initially look for alternative housing in or around Elk because she expected her house to be repaired, and could stay in Hayden in the meantime; and (4) she did not look for alternative housing in spring 2017, because at that point she had made the decision to move to Coeur d'Alene and live with Mr. Reed. While Mr. Crain states that Ms. Pearson had the alternative of living with her parents

temporarily, the testimony he cites merely established that she did not ask them if she could stay. She was not asked *why* she did not ask, and she did not testify that it would have been permitted.

In short, she testified to why the alternatives suggested by Mr. Crain's lawyer were not desirable or feasible. Mr. Crain argues they were nonetheless possible. Of course, there was no evidence that it was not "possible" for Mr. Crain to move to Coeur d'Alene.

A desire to establish a home with one's partner is a legitimate reason to seek relocation. *Shrauner*, 16 Wn. App. 2d at 412. It was for the trial court to weigh evidence bearing on the parties' alternatives, and how reasonable they were. Again, we do not reweigh the evidence. *Kim*, 179 Wn. App. at 244.

> *Factor 10: The financial impact and logistics of the relocation or its prevention*

The trial court found, in light of a lack of evidence on this factor, that it would not weigh against relocation. It found:

> The only real testimony came from Mr. Crain when he discussed the cost of gas and the wear and tear on a vehicle. There was no testimony on how the transportation costs would be different between Elk and Mr. Crain's home and Hayden and Mr. Crain's home.

CP at 310.

Mr. Crain argues that the trial court "ignored all evidence of the financial impact," which he contends was not only transportation costs (which he characterizes as

"significant") but also his increased child support obligation, which he argues has gone from zero to $460 per month. Appellant's Br. at 63-64.

The "evidence" of the former came up in Mr. Crain's cross-examination and consisted of the following:

> Q. Sure. Would it be fair to say the financial impact that the Court has to consider would really be the wear and tear and gas caused on the vehicle for the eleven miles each way?
>
> A. And the amount of money that we spend on lawyers' fees.
>
> Q. Okay. But that is because everybody has a right to object; right?
>
> A. That's correct.

CP at 173-74. No evidence was presented of a projected cost for the wear and tear and gas.

Mr. Crain did not identify his increased child support obligation as an additional financial impact of relocation during the trial. The testimony he points to on appeal came up in a different context: redirect examination in which he was questioned about the "Designation of Custodian" section of the 2014 parenting plan. Mr. Crain's lawyer's questions appear to relate to the impact of a possibly different school schedule—not relocation—and Mr. Crain offered no projection of what the financial impact might be:

> Q. And then for purposes of this—the final sentence: For purposes of child support, residential schedule credit, this designation does not infer or imply the mother to be the primary parent.
>
> Okay? And that was your agreement?
>
> A. Correct.

Q.    Okay.  You knew when she started kindergarten things would change.
        But certainly we're still not starting kindergarten, so we're back when she's still at preschool; correct?

A.    Correct.

Q.    And that is significant in the sense that how much child support do you pay?

A.    No child support.

Q.    Child support order says you don't pay anything.

A.    That's correct.

2 RP at 183.

Mr. Crain did raise the prospect of a possibly higher child support obligation in his 2020 trial brief, but he did not provide a projection of what the amount would be, and again, there was no projection of the amount in the trial record.  The $460 figure he argues on appeal is new.

Substantial evidence supports the trial court's finding that the only trial evidence of the financial impact of *relocation* was evidence of gas and vehicle wear and tear, for which no cost evidence was provided.  Given the dearth of evidence, the trial court did not abuse its discretion by finding that the factor would not weigh against relocation.

We affirm the "Final Order and Findings on Objection about Moving with Children" entered on October 13, 2020, with the exception of those portions of (1) its section 6, and (2) the "Parenting/custody order" provision of section 12 that are

No. 38644-9-III
*Crain v. Pearson*

inconsistent with this opinion. We reverse the parenting plan entered on November 18, 2021, and remand for further proceedings consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.P.T.

WE CONCUR:

Fearing, C.J.

Staab, J.